GARLOCK, Administratrix, Appellant, vs. CHICAGO, MIL-
    WAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY,
    Respondent.

*February 16—March 29, 1948.*

For the appellant there were briefs by *Karon & Weinberg,* attorneys, and *Philip Weinberg* of counsel, all of Milwaukee, and oral argument by *Mr. Weinberg.*

For the respondent there was a brief by *Bender, Trump & McIntyre,* attorneys, and *Rodger S. Trump* of counsel, all of Milwaukee, and oral argument by *Rodger S. Trump* and *Rodger M. Trump.*

FRITZ, J.   On February 26, 1945, at 10:30 a. m., Fern Garlock was killed as the result of a collision between a truck

driven northward by him and a westbound train operated by defendant at the grade crossing of its railway track and New-comb street in the city of Whitewater. At that crossing New-comb street extends north and south with a straight and level eighteen-feet-wide concrete roadway; and defendant's sixty-six-feet-wide level right of way extends east and west and crosses Newcomb street at right angles, with two rails in the center of its right of way and a few trees and poles along the south line thereof east of Newcomb street; and immediately east thereof there is a striped post with a railroad warning sign, eight feet south of the center of the railroad track. Eighty and three-tenths feet south of the said center there is, on the east side of Newcomb street, a "Machine Shop," which is sixteen feet seven inches high at its ridge, and nine feet five inches high at the eaves. At the time of the collision New-comb street and the railroad crossing were covered with a thin film of snow and ice, and Garlock was driving his large milk truck with an inclosed cab toward and onto the railroad cross-ing at a speed of about ten to fifteen miles per hour. The collision resulted also in the immediate death of a man riding with Garlock. The train consisted of a steam engine, a bag-gage car, and a coach. Its fireman, Edwin Hilgendorf, was seated on the south side, and its engineer, James McCarthy, was seated on the north side in the engine. They estimated the train's speed at between twenty-five and thirty miles per hour when the Garlock truck was struck at the crossing.

The only other eyewitness to the collision and events im-mediately preceding and leading up to it is Helen Westrick, who was in her home on State street, immediately north of the track and three hundred eighty-eight feet east of the center of Newcomb street. She testified that from a southwest window she had a clear view of Newcomb street north of the machine shop, and of defendant's tracks and the railway crossing; that she observed Garlock's truck moving very slowly northward on Newcomb street, without stopping, as it passed the north

wall of the machine shop; that no part of the train was then yet in her sight, but she heard its whistle and kept looking at the moving truck and the crossing; and that when the front end of the truck was about even with the railroad-warning sign on the post, eight feet south of the center of the railroad track, the engine was in front of her house, but then the moving train cut off her view of the crossing and immediately thereafter she saw parts of the truck fly into the air. She testified also that when a steam engine passes the front of her house, it vibrates her house and she can tell from the resulting vibration when an engine is in front of her house, without actually seeing it; and that she saw the front of Garlock's truck at the said railroad sign, eight feet south of the center of the rails, at the moment she felt the vibration which occurred when the defendant's engine was just passing in front of her house.

The track runs in a straight line from about a mile east of the Newcomb street crossing and the fireman had a clear view of that crossing and the area between the track and the north wall of the machine shop all the time the train was traveling the last mile to the crossing. He testified he watched that area during all of that time; that he kept his eyes on that crossing and the eighty feet south thereof from the time the train entered the city limits until it hit the truck; and that until the truck was right on the track, he did not see it, or any other traffic, pass through the eighty-feet space between the north wall of the machine shop and the track, although there was nothing to prevent him from seeing the truck cover that space after its front end cleared the machine shop. The engineer testified he never saw the truck at all before the engine struck it at the crossing and never applied the brakes on the engine at any time until, when it hit the truck, he applied all emergency brakes, but the engine continued on for eleven hundred forty-one feet. Under sec. 192.29 (1), Stats., the speed limit while the train was being operated in the city of Whitewater was fifteen miles per hour. The fireman testified that if the train

had been traveling at that speed as it approached the Newcomb street crossing it could have been stopped in between one hundred to one hundred fifty feet by application of the air brakes. On adverse examination before trial the engineer testified that if the train had been traveling toward the crossing at the maximum lawful speed of fifteen miles per hour he could have stopped the train by releasing the air pressure in about one hundred fifty feet, considering all conditions which existed there that day; but on the trial he testified he thought it would take about two hundred feet to stop the train. The additional speed of fifteen miles per hour, making a total speed of thirty miles per hour, increased the space needed to stop the train by an additional nine hundred feet.

In the form for verdict submitted to the jury the court directed a finding that the train was being operated faster than fifteen miles per hour while approaching and within twenty rods of the crossing where the accident occurred; and in connection therewith the court submitted to the jury a question whether such speed in excess of fifteen miles per hour was a *cause* of the accident. That question was answered "yes" by the jury, with the exception of Juror Jessen who dissented. Upon motions after verdict the court changed that answer of the jury by substituting therefor the finding that such excessive speed was *not a cause* of the accident. In answer to the only other question submitted to the jury in respect to negligence on the part of defendant, the jury found that the fireman did not fail to exercise ordinary care in keeping a proper lookout; and that finding was not set aside by the court. As there was then no finding in the verdict of any causal negligence in any respect on the part of defendant, there remained no basis for a judgment in favor of plaintiff for her recovery of damages from the defendant. On the other hand, in relation to Fern Garlock, there remained in the verdict the jury's findings that he was causally negligent in respect to (a) keeping a proper lookout, (b) listening for the approach of the train and (c) causing his truck to come to a full stop before it was

driven on or across the crossing; and that his negligence in each of these respects was more than a slight want of ordinary care.

On this appeal, plaintiff contends the court erred in changing the jury's finding that the speed of the train in excess of fifteen miles per hour was a *cause* of the accident by the court substituting therefor its finding that such excessive speed was *not* a cause thereof. In considering this contention there must be noted the following additional matters which were established by the evidence beyond dispute in any material respect. As Garlock was engaged in the business of transporting milk for hire as a duly licensed "contract motor carrier" (within the definition of that term in sec. 194.01 (11), Stats.), there were applicable to him the provisions in sec. 85.92, Stats., that any person operating such a motor vehicle, who shall drive such vehicle on or across such a grade crossing (as is involved herein) "without coming to a full stop at a distance from such tracks of at least twenty and not more than forty feet, shall be deemed guilty of a misdemeanor. . . ." As he approached and drove onto the track at the crossing in question Garlock continued driving onward at a speed which witnesses estimated as between ten and twenty miles per hour. When he was seventy-five feet from the crossing he had a view of seven hundred fifty feet to the east down the track on which the train was then approaching; and when he was thirty feet from the crossing there was an unobstructed view to the east for twenty-six hundred feet down that track. Throughout all that distance the track was straight and the train did not emerge from a curve or any obstruction beyond which Garlock could not have seen the approaching engine, the bell of which was ringing automatically from the time it was about a mile east of the crossing until it stopped, after the accident; and the whistle of which was sounded for this crossing beginning at the whistle post thirteen hundred feet away east of the crossing. Four separate blasts were given; and the last prolonged blast continued while the train was passing the machine shop and

until it stopped just after the crash. Consequently the approaching train was in sight and within the hearing of Garlock for a sufficient time and distance to enable him, in the exercise of ordinary care, to make adequate appraisal of the situation by duly looking and listening in ample time to avoid a collision by stopping the truck before entering upon the track, as required by sec. 85.92, Stats. As those circumstances and the presumption against any intention on the part of Garlock to commit suicide warrant and compel the conclusion that he evidently failed to see or hear the train, it follows that he could not have formed any judgment based on the speed thereof; and that under these conditions the excessive speed was not a proximate cause of the collision. As we said in *Bellrichard v. Chicago & N. W. R. Co.* 247 Wis. 569, 577, 20 N. W. (2d) 710,—

"That speed standing alone cannot be the cause of a crossing accident has been held in the following cases [citations]. . . . In some cases, as for example that of *Webster v. Roth,* 246 Wis. 535, 18 N. W. (2d) 1, the extremely high speed of the train, combined with its silent operation and failure to sound appropriate warnings, may contribute to cause a collision either by inducing plaintiff to take an insufficiently extended view of the tracks or by misleading plaintiff as to the train's actual speed. *Where, however,* (1) the *train was in sight for a sufficient distance so plaintiff could make a timely and adequate appraisal of the situation;* (2) *its speed did not mislead plaintiff* (either because it was not extremely high, because the train did not emerge from a curve or obstruction beyond which plaintiff could not see, *or because plaintiff did not see it or form any judgments based on its apparent speed*); (3) there were no defaults on the part of its operators which could in combination with the speed of the train produce a dangerous situation such as existed in the *Webster Case, supra,* the *violation of the statutory rule as to speed cannot be held to constitute a cause of the accident.*"

Consequently, the court rightly changed from "yes" to "no" the jury's finding that excessive speed was a proximate cause of the accident.

Under the evidence there was no other issue in respect to causal negligence on the part of defendant in the management and control in operating the train excepting the issue as to whether the fireman failed to exercise ordinary care with respect to keeping a proper lookout. Upon duly submitting that issue to the jury it found that the fireman was not negligent in that respect. On motions after verdict and on this appeal plaintiff contends that it was established by evidence beyond dispute that the fireman did fail to exercise ordinary care in keeping a proper lookout, and that therefore the court should, on motions after verdict, have either changed the jury's answer in that respect by the court's finding he was negligent, or should have granted plaintiff's motion for a new trial. Plaintiff's contention cannot be sustained. There was testimony by the fireman that he saw the truck when it was fifteen feet from the track and that when he saw it come upon the track he hollered "stop" to the engineer before the collision. That testimony was corroborated by the engineer, and consequently there was a jury issue as to whether the fireman, in view of his numerous duties, as stated in *Keegan v. Chicago, M., St. P. & R. R. Co.* 251 Wis. 7, 27 N. W. (2d) 739, and *Hynek v. Kewaunee, G. B. & W. R. Co.* 251 Wis. 319, 29 N. W. (2d) 45, failed to exercise ordinary care in not seeing the truck sooner and realizing that Garlock would drive on the track without looking and listening for a train and without first coming to a stop as he, as a "contract motor carrier," was required to do under sec. 85.92, Stats.

Furthermore, in relation to the matter of defendant's management and control of the train, it is claimed by plaintiff's counsel that prior to the submittal to the jury of the questions for a special verdict he requested the court to submit also questions as to whether defendant's employees were causally negligent in the "management and control" of the train; and plaintiff contends the court erred in failing to submit such questions pursuant to that request. On this subject defendant claims no

timely request for the submittal of such questions was made on behalf of plaintiff and that under the evidence there was no issue as to defendant's management and control in any other respect than was stated on questions submitted by the court to the jury. Plaintiff's contention in this respect cannot be sustained. An examination of the bill of exceptions as to the proceedings on the trial discloses that no such request by plaintiff's attorney is recorded in the bill of exceptions certified to by the official court reporter; and that evidently there was no such question prepared and submitted to the court by plaintiff's counsel.

The facts that by reason of dissents by three jurors, all told, the same ten jurors did not agree on certain other findings as to negligence, contributory negligence, and comparative negligence are immaterial in this case because all those other findings became of no further consequence upon the court's finding and concluding that, as a matter of law, the speed of the train in excess of fifteen miles per hour was not a cause of the accident, and the jury's finding, without any dissent, that the fireman did not fail to exercise ordinary care with respect to keeping a proper lookout. By reason of the findings in these two respects and the absence of any causal negligence on the part of defendant in any other respect, there can be no judgment for the recovery of damages herein by plaintiff.

*By the Court.*—Judgment affirmed.